CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

DEC 16 2019

JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | **UNDER SEAL** |
| v. | ) | |
| | ) | Criminal No. 3:19-mj-00069 |
| TIMOTHY LITZENBURG, | ) | |
| | ) | |
| Defendant. | ) | |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Kevin Towers, being duly sworn, hereby depose and state as follows:

### Introduction

1. I am a Postal Inspector employed by the United States Postal Inspection Service ("USPIS") and have been so employed for over fourteen years. As a Postal Inspector, I received training in investigating violations of federal statutes, including those regarding conspiracy, wire fraud, money laundering, and other financial crimes. More specifically, I have conducted physical surveillance, electronic surveillance, executed search warrants, analyzed phone and text records, and obtained and reviewed financial documents and records of fraudulent activity. I have also spoken to suspects, defendants, witnesses, and other experienced investigators concerning the methods and practices of criminal enterprise groups, especially those involved in financial crimes.

2. This affidavit is made in support of a criminal complaint charging Timothy Litzenburg with transmission of interstate communications with intent to extort (in violation of 18 U.S.C. § 875(d)), conspiracy to commit transmission of interstate communications with intent to extort (in violation of 18 U.S.C. § 371), and attempted extortion, as well as conspiracy to commit extortion (in violation of 18 U.S.C. § 1951).

1

3. This affidavit is based on my personal investigation and the investigation of others, including federal law enforcement officials whom I know to be reliable. The facts and information contained in this affidavit are based upon information provided by witnesses and my review of records, documents, and other physical evidence obtained during this investigation.

4. This affidavit does not include each and every fact known to the government, but only those facts necessary to support a finding of probable cause to support the requested arrest warrant.

## Probable Cause

### I. Litzenburg's Initial Contact with Company 1

5. According to public records from the Virginia State Bar, Timothy Litzenburg is an active member of the bar whose office is located on Westminster Road in Charlottesville, Virginia. Litzenburg lists his employer as "Roundup Cancer Firm plc." According to public records from the Commonwealth of Virginia State Corporation Commission, Roundup Cancer Firm, LLC was formally registered as a Virginia corporation on or about September 24, 2018. Litzenburg is listed as the registered agent for the Roundup Cancer Firm.

6. According to public sources, Litzenburg has been involved in litigation against Monsanto, a chemical company that manufactured, among other things, a weed-killer sold under the brand name Roundup. Roundup's active ingredients include glyphosate, a chemical allegedly linked to non-Hodgkin's lymphoma.[1]

---

[1] According to a 2018 civil complaint, Litzenburg was previously employed at a Virginia law firm that focuses on representing plaintiffs in personal injury matters. *Miller Law Firm v. Litzenburg*, No. CL 18001118 (Orange Cty. Cir. Ct.). The civil complaint alleges, in or around June 2018, Litzenburg "actively began to surreptitiously steal The Miller's Law Firm's confidential information and trade secrets." The civil complaint sues Litzenburg for breach of fiduciary duty; tortious interference, statutory business conspiracy; common law civil conspiracy; misappropriation of trade secrets; and violation of the Virginia Computer Crimes Act.

2

7. Company 1 is a privately owned chemical manufacturer, with facilities located all over the world. In or around 2018, Company 1 was acquired by Company 2, a publicly traded U.S. corporation listed on the NASDAQ exchange.

8. In or around early September 2019, Litzenburg transmitted to Company 1 a draft complaint ("Draft Complaint") on behalf of Person 1, whom Litzenburg claimed to represent. The Draft Complaint alleged that Company 1 and other related companies created several chemical compounds used by Monsanto to create Roundup, some of which the Draft Complaint alleged to be carcinogenic. Among other things, the Draft Complaint alleged that Company 1 knew of the carcinogenic properties of these chemicals but failed to warn Roundup users and others exposed to Roundup about those risks.

9. After receiving the Draft Complaint, Company 1 retained outside counsel to communicate with Litzenburg. On or about September 11, 2019, an attorney representing Company 1 ("Attorney 1") spoke with Litzenburg by telephone.[2]

   a. According to Attorney 1, on the September 11, 2019 call, Litzenburg described himself as being involved in mass torts litigation since approximately 2012. Litzenburg also stated that he was working with a Chicago-based attorney ("Associate 1") and another Virginia-based attorney ("Associate 2") on potential other Roundup-related litigation.[3]

---

[2] During telephone calls involving Litzenburg and Attorney 1, one or more other members of Attorney 1's law firm listened to the conversations but did not participate. These associates were generally not introduced on the telephone line, such that Litzenburg may not have been aware they were on the line.

[3] During communications with Company 1 and their outside counsel, Litzenburg repeatedly has claimed to be working with Associate 1. Neither Company 1 nor Law Firm 2 (the law firm retained by Company 1) has ever been contacted by or had communications with Associate 1 or associates from his Chicago-based law firm.

3

b. According to Attorney 1, Litzenburg said that he was considering filing the Draft Complaint involving Person 1 unless he was granted an in-person meeting with representatives of Company 1. Litzenburg said he would postpone filing the Draft Complaint for two weeks in order to accommodate an in-person meeting.

10. Following the September 11, 2019 telephone call, Litzenburg and Attorney 1 continued to exchange emails and telephone calls about possible further meetings. During the course of communications, Litzenburg pressed for an in-person meeting in Charlottesville, Virginia. In an email to Attorney 1 on October 15, 2019, Litzenburg wrote that he "had no intention of holding [the Draft Complaint] until November . . . . However, as one more gesture of good faith . . . I would be willing to hold off a couple of weeks under the following terms," which included scheduling a meeting on "Halloween" in "Charlottesville, where I generally conduct most significant and discreet business."

**II. Litzenburg's First Demand for a $200 Million "Consulting Agreement" from Company 1 or Company 2, in Exchange for Not Advising Clients to Sue Company 1**

11. On or about October 16, 2019, Litzenburg and Attorney 1 had another telephone call. Associate 2 also participated on the telephone call. During the telephone call, Attorney 1 was outside the Commonwealth of Virginia at the time the communication occurred.

a. According to Attorney 1, Litzenburg stated during the call that he still intended to file the Draft Complaint, unless a resolution could be found. Litzenburg indicated that if he did file a public lawsuit, other lawsuits would likely follow as the public became aware of Company 1's role.

b. According to Attorney 1, Litzenburg and Associate 2 indicated that they represented 800 clients in Roundup-related litigation against Monsanto. Litzenburg indicated that, to date, he had not informed any Monsanto client about Company 1

4

or the possibility of bringing a Roundup-related lawsuit against Company 1.

    c. According to Attorney 1, after describing the possibility of the lawsuits against Company 1, Litzenburg proposed that he and Associate 2 could enter into a "consulting arrangement" with Company 1. Doing so, Litzenburg stated, would create a purported conflict-of-interest that would effectively stop him from representing plaintiffs in litigation against Company 1.

12. On or about October 18, 2019, Litzenburg and Attorney 1 had another telephone call in which Litzenburg again raised the issue of entering a "consulting agreement" with Company 1. During the telephone call, Attorney 1 was outside the Commonwealth of Virginia.

    a. According to Attorney 1, Litzenburg stated that as a first step, he wished to settle the case between Person 1 and Company 1 for $5 million.

    b. According to Attorney 1, separate from the $5 million settlement for Person 1, Litzenburg indicated that he separately wanted "consulting arrangements" for himself and Associate 1 worth a total of $200 million. Litzenburg described the $200 million as the "bottom line." According to Attorney 1, Litzenburg also indicated that, instead of the "consulting agreement" being with Company 1, he would also accept a "consulting agreement" with Company 2 (of which Company 1 was a subsidiary).

    c. According to Attorney 1, Litzenburg also clarified that the $200 million would not be used to resolve any of the potential lawsuits that could be brought by Litzenburg's other clients. Litzenburg stated that the $200 million in "consulting" fees would not result in additional releases from litigation by those plaintiffs.

5

### III. Litzenburg's Written "Demand" for a $200 Million "Consulting Agreement" from Either Company 1 or Company 2

13. On or about October 24, 2019, Litzenburg emailed Attorney 1 (who was outside the Commonwealth of Virginia at the time): "Please accept this email as a written demand in follow up to our discussion about the same." In the email, Litzenburg reiterated his demand for a $5 million settlement for Person 1 and a separate $200 million "consulting agreement" for himself and his associates.

14. Litzenburg described resolving Person 1's case as "only a first step." Litzenburg then said if Person 1's case is resolved, "We would simply advertise and sign up more users of Roundup home products that contain [Company 1 chemicals]. In fact, that is precisely our plan, absent some agreement to the contrary."

15. Litzenburg continued, "The [Company 1] non-Hodgkin lymphoma litigation that we are planning will be 'Roundup Two,' and I'm excited to lead the charge again. This time, to my great financial benefit."[4] Litzenburg stated that if he filed suit against Company 1, "[t]here would quickly be a docket of thousands of cases against [Company 1]."

16. If litigation commenced, Litzenburg warned, "[t]his become [sic] an ongoing and exponentially growing problem for [Company 1], particularly when the media inevitably takes notice. The defense costs and cost to ultimately resolve the thousands or tens of thousands of cases would be well into the billions, setting aside the associated drop in stock price and reputation damage."

17. Instead of the supposed consequences of litigation, Litzenburg suggested "a potential

---

[4] Litzenburg claimed in his email to have been instrumental in prior Roundup litigation, stating in part, "I filed the first Roundup case against Monsanto, retained the first experts, took the first depositions, and likewise maneuvered the first case to trial and a $289.2 million verdict for my client . . . ."

6

solution" that would avoid the costs associated with litigation, reputational damage, and a drop in stock price. Specifically, Litzenburg proposed that Company 1 and Litzenburg "enter into a consulting arrangement with [Company 1] or a related entity, or somw otjer wuch relationship [*sic*]," that would "prevent my firm . . . from suing [Company 1]." Litzenburg claimed that with such a "consulting arrangement," "[Company 1] would weather the storm and avoid the parade of horribles I outlined in short form above."

18. Litzenburg continued, "Our demand/proposal related to a consulting agreement with my firm and [Associate 1] is two hundred million ($200,000,000) to be shared by our firms. As I previously mentioned, please do not misconstrue this demand as indication that we would accept half that or less." Litzenburg later described the $200 million "demand" as "a very reasonable price" compared to the "significant financial consequences to [Company 1] of a protracted and public 'Roundup Two.'"

19. Litzenburg concluded by reiterating his request for an in-person meeting on "Halloween" (October 31, 2019) in Charlottesville, Virginia and stating, "I hope the [Company 1] Board and any other decisionmakers have a chance to consider these demands/proposals...Just to set expectations, this is something we would like to resolve in 2019 or have litigation well underway by January 1, 2020."

IV. **Litzenburg Discusses His Demand for $200 Million "Consulting Agreement" During a Consensually Recorded Call and Offers to "Take a Dive" During a Deposition**

20. On or about October 29, 2019, Company 1's outside counsel contacted prosecutors from the U.S. Department of Justice ("DOJ") regarding Litzenburg's actions. On or about October 30, 2019, DOJ prosecutors and I spoke telephonically with Company's 1 outside counsel. During that call, Attorney 1 summarized her prior contacts with Litzenburg. Attorney 1 also reported that she and another attorney, Attorney 2, expected to speak telephonically with Litzenburg on or about

7

October 30, 2019. Attorney 1 and Attorney 2 agreed to allow USPIS to record this telephone call.

21. On or about October 30, 2019, Attorney 1 and Attorney 2 spoke telephonically with Litzenburg, who they understood was in Charlottesville at the time. During the call, Attorney 2 asked how Litzenburg came arrived at the $200 million figure he had asked for in "consulting" fees. Litzenburg responded, "It's opportunity loss," later adding, "I think it's lower than the extraordinarily low end estimate of what [Associate 1] and I would make off this litigation."[5] Litzenburg also added,

> [T]he way that I guess you guys will think about it and we've thought about it too is savings for your side. I don't think if this gets filed and turns into mass tort, even if you guys win cases and drive value down . . . I don't think there's any way you get out of it for less than a billion dollars. And so, you know, to me, uh, this is a fire sale price that you guys should consider, uh, you know, for a limited time.

22. Attorney 2 then asked about where the $200 million from Company 1 would be sent, asking "the money is not going into a[n] . . . individual plaintiff's compensation fund or anything like that. This is money that's going straight to you and your partners, correct?" Litzenburg responded,

> [I]t is our analysis [*inaudible*] retainer Virginia Law and actually American Bar sort of standard law that we have no obligation at this time to, um, recommend to our clients to, uh, add [Company 1] into a suit, uh, because of manufacturers I've laid out for you before. That doesn't mean we're prohibited from doing it, but we think very strongly that we have no obligation to do so whatsoever.[6]

---

[5] The language quoted from consensually recorded calls and meetings in this affidavit are draft transcripts. The government continues to review the transcripts for accuracy. Certain verbal tics and non-substantive sounds have been omitted for ease of reading.

[6] Litzenburg also said, "We have to carefully research everything. But we have already been doing so with some of the top ethics lawyers and big firms already, asking some general questions about this." Litzenburg never identified those purported "ethics lawyers" or their analysis to Company 1 or the lawyers representing them.

8

23. Attorney 1 asked how the "consulting arrangement" with Company 1 would prevent lawsuits from getting filed. Litzenburg responded in part, "I think we can talk to people we knew, if they were thinking of going that route [i.e., thinking about suing Company 1]. I think [Associate 1] is gonna be a real asset there. Anybody thinking of filing a mass tort [lawsuit] in Chicago is gonna come to [Associate 1]. And if he says, "We thought about that. We thought it was a terrible idea. Move on." Litzenburg clarified, "Of course I've explained to you guys what I think I win with juries is on causation, but nobody else is going to figure that stuff out. Um, and I think the likelihood people come to me or [Associate 1] first, uh, before even going down that road is pretty . . . is pretty high."

24. Later in the telephone call, Litzenburg told Attorney 2: "You could forward your own toxicology experts or something at a pre, uh, trial, um, deposition. I mean, a pre-suit deposition as part of some sort of, you know, negotiation with a pre-suit. And we ask the wrong questions." Litzenburg explained that, as a result, "you would have a deposition transcript where I basically got whacked, um, but did nothing. . . . And that could sort of be something that you kept in a vault somewhere to pull out if you ever got bothered by someone that didn't know me or whatever." Litzenburg later described this tactic as one where he would "almost sort of take a dive as long as it's legal, and ethical, and best for our one client."[7]

25. At another point of the conversation, Litzenburg suggested that, as part of the deposition exercise in which he would "take a dive," Company 1 and Person 1 could purport to

---

[7] During his communications with Company 1, Litzenburg has repeated variations of the phrase "legal and ethical" dozens of times. Litzenburg never elaborated on that statement beyond repeating it frequently, nor has ever identified an action he would *not* take due to ethical or legal considerations.

9

execute a "high-low agreement,"[8] with the minimum amount set at the actual amount demanded by Litzenburg. Litzenburg explained that they would settle for the "minimum" in the purported high-low agreement after the deposition, making it appear that Person 1's lawsuit had not been successful in the deposition stage of the proceeding.

26. During the recorded telephone call, Litzenburg repeatedly said that he represented hundreds of clients in pending Roundup-related litigation against Monsanto; Litzenburg also stated that he would continue representing them in the Monsanto litigation. At one point, Attorney 1 asked what would prevent the clients from "switch[ing] law firms and then up bringing another claim against [Company 1]." Litzenburg responded:

> Well, I have no idea what would prompt that, I guess, is my first question. Um, I have no idea what would cause that. None of them have ever heard of [Company 1]. Uh, none of them have ever heard of [name of company affiliated with Company 1]. Um, and, uh, again, our analysis is with a settlement right around the corner, some of them waiting some years, um, we're not going to suggest that they wait another five years to get a Chicago trial date when they have probably a…a bird in the hand right around the corner.

27. Talking about other clients he purported to represent in the Roundup litigation against Monsanto, Litzenburg stated that he was "[a]bsolutely not" obligated to recommend to clients the possible litigation against Company 1. Litzenburg claimed that "our retainer gives us, uh, the…the full discretion to decide what entities are…are most worth going after for you to get the most in the…the least amount of time essentially." Litzenburg implied that he could therefore steer away those existing clients away from Company 1 if the parties reached a "consulting agreement."

---

[8] In mass torts, a "high-low agreement" is an agreement between the parties that caps the minimum and maximum amounts of recovery, thereby giving the parties some assured level of recovery while limiting the highest possible recovery.

10

## V. Litzenburg Demands a Consulting Agreement to "Avoid the Parade of Horribles" of Having Him Sign Up "Thousands of Future Plaintiffs" Against Company 1

28. On or about November 6, 2019, Litzenburg continued to seek a consulting agreement in an email to Attorney 1 and Attorney 2.

   a. Litzenburg began by claiming to have "a simply list of 1000ish Roundup clients who hired me to sue Monsanto and that number is growing every day." However, Litzenburg said that Person 1 "is the only client with whom we have had discussions about a claim against [Company 1]." However, Litzenburg said that without a consulting agreement, he predicted he would have "thousands of future plaintiffs against [Company 1]," which he could find through "our extensive network of referral lawyers, lead generators, and advertising machinery that you know well could produce . . . thousands of new claimants/clients for me and [Associate 1] by the new year."

   b. Litzenburg continued, "While I cannot guarantee and warrant complete finality . . . [Company 1] will be exceedingly well-positioned to weather this storm if it settles my single case . . . and if we subsequently agree to offer consulting . . . ." Entering a "consulting agreement," Litzenburg claimed, "will mean that [Company 1] avoids the parade of horribles that has been the Roundup litigation for Bayer/Monsanto."

   c. Litzenburg concluded, "That is another thing I can guarantee and warrant: in the absence of a so-called 'global' or final deal with me, this will certainly balloon into an existential threat to [Company 1]."

## VI. Litzenburg Says He Is Company 1's "Biggest Problem" and Warns of a "40% Stock Loss" Unless They Enter a $200 Million "Consulting Agreement"

29. Litzenburg had repeatedly requested an in-person meeting with the attorneys

11

representing Company 1. On or about November 12, 2019, attorneys representing Company 1 met Litzenburg at a conference center in Charlottesville, Virginia. Associate 2 was also in attendance. Attorneys representing Company 1 consented to the USPIS recording the interview, and the meeting was held in a room USPIS personnel had wired for audio and visual recordings.

30. At the beginning of the meeting, Litzenburg made the following introductory comments:

> I assume that a company as smart as [Company 1] and [Company 2] has had reserves in this, whether you guys were involved or something from the . . . it's been a concern I am sure. You don't have to try to convince me otherwise.
>
> Um, and I'm sure if they've been watching the litigation, those reserves are multiples of what we're talking about here. Um, and they've been biting their nails for years over this, um, waiting to see, you know, if this problem is gonna come to a head. And we have brought the problem to a head, but only among the people in this room.
>
> And so there is now a problem to solve that I think brings certainty. Um, you know, all I'm certain of is, um, we're gonna be the leading edge of the next mass torts. . . . You know, I took a hard left at pharmaceuticals. I may take a hard left at chemicals and pesticides. We'll see. I mean, that…that remains to be seen and…and decided largely by, you know, your client.
>
> Um, but I'm sure that we'll be, um, leading that and…and…and...both formally and informally. Um, what's…what's certain, uh, is that if we walk out of here today without a deal, and we, uh, you know, the [Person 1] case gets filed and gets served. And we've talked about the consequences.

31. Early on in the meeting, Litzenburg stated that if litigation commenced, there was no way Company 1 "gets out of it for less" than "[a] billion. Yeah. No, I mean, nuisance value, uh, defense lawyer fees, a hit in the stock when this gets filed and served, maybe the press conference, whatever." Litzenburg then continued,

12

[W]e can be, um, your biggest problem. Right now we're your only problem or potential problem. Uh, we have one identified certain conflict that...that we can discuss, and we can discuss other...discuss some other creative ideas. Uh, or we can be an asset. You know? And I've...I've talked about creative ways to not only make the problem go away but, um, try to help [Company 1] and perhaps its sister companies avoid this problem and other problems in the future.

32. Later on, Litzenburg again stated the litigation he contemplated would have adverse effects on stock price.[9]

> We walk out of here today, and you're telling them, you know, "You are absolutely, absolutely making a quarter of a million, 500 million, billion plus dollar investment in a public relations nightmare." You know, [*inaudible*] in a 40% stock loss coming off the top. And that...that's what they're deciding between is whether to avoid that, uh, or to buckle down for that. Uh, you know, there is no... I mean, I know you're gonna have to call and tell your client. The client is gonna be understanding probably 'cause they're gonna be saying, "We don't have to deal with this." They've got a way bigger than a quarter million dollar investment in a...in a nightmare.

33. During the meeting, attorneys representing Company 1 inquired about the "deposition" that Litzenburg proposed doing before. Litzenburg responded:

> Um, I mean, it depends on what we're asking for. But yeah, [*inaudible*] prevents exposure for y'all and erase the trail, like we've talked about. . . . [I]t borders into misrepresentation and taking a dive sort of thing. I think it's okay as far as we've looked at. But for . . . for reasons that . . . It would [*inaudible*] for us in reasons I'm sure you can figure out, um, to do on a first case before we have . . . We can't do it under a consultancy with you before we, um, settle this case. I don't think it's an in either of our best interest. But, um, you know, I tossed it out there. If there is some way that you guys can ensure that that, uh, you know, happens legally and ethically, and then there is a surety on our part that's followed by this consultancy.

---

[9] While Company 1 was privately held, its parent company, Company 2, was publicly traded on a U.S. exchange. Litzenburg repeatedly referred to Company 2 during calls and meetings with Company 1's counsel, indicating he was aware of the relationship.

13

At another point, Litzenburg was asked who would be deposed. Litzenburg responded, "I was suggesting your toxicologist. Um, I think that would be better than trying to set up something where, like, our tox[icologist] takes a dive."

34. During the meeting, attorneys representing Company 1 asked what entity would serve as the entity to which the $200 million would be paid. In Litzenburg's presence, Associate 2 stated the money would be paid to "Golden Ratio LLC," and confirmed that Associate 2 and Litzenburg were the beneficial owners of Golden Ratio, which is a Virginia entity.

   a. According to public records from the Commonwealth of Virginia State Corporation Commission, "Golden Ratio, LLC" is an active Virginia corporation registered on or about October 21, 2019 (after Litzenburg first made the "demand" that Company 1 enter a consultancy with him).

   b. Associate 2 is listed as the registered agent of Golden Ratio, LLC.

35. During the in-person meeting, Litzenburg was asked what would prevent his current client, Person 1, from telling other people about her settlement with Company 1, were it to happen. Litzenburg clarified that Person 1 had not seen the draft complaint sent to Company 1 in her name, and he did not believe he had ever mentioned the name of Company 1 to Person 1.

### VII. Litzenburg Outlines Details of His Demand for $200 Million in "Consulting Agreements" with Company 1 and Company 2

36. On or about November 14, 2019, Litzenburg sent Attorney 1 and Attorney 2 an email with the subject "Consult," in which he discussed details regarding "a potential consulting relationship with [Company 2] if and when I have no conflicts."

   a. Litzenburg began by describing two "consulting arrangements": one for himself and Associate 2, and separate agreement for Associate 1. Associate 1's "consulting" arrangement, Litzenburg explained, would be with Company 1.

Litzenburg, in turn, proposed that he and Associate 2 would "consult for an entity other than that which owns [Company 1]," and then suggested a subsidiary of Company 2 that he said did not directly own Company 1.

b. Litzenburg wrote, "The price has been discussed. The relationship would begin on execution of agreement . . . with full payment contemplated on Jan 2, 2020." Litzenburg then directed that the payment should be made "to our business Golden Ratio LLC."

c. Litzenburg also stated that he would not work any substantial work for Company 2. "While I would engage fully and seriously with [Company 2], etc., when needed, I would expect the total active consulting to not to amount to more than a few weeks per year."

37. On or about November 14, 2019, Litzenburg sent Attorney 1 and Attorney 2 a second email with the subject "expert." As discussed above, Litzenburg at one point proposed that he could assist Company 1 by "tak[ing] a dive" during a deposition of a toxicology expert, in order to undermine the merits of any subsequent litigation against Company 1. In furtherance of his proposed "dive," Litzenburg's second email included written questions that he would "expect [to be] the substance of a probably two-hour bellwether tox[icology] expert depo[sition] to be, such as we discussed." Litzenburg then included approximately thirty-seven topics and questions dealing with toxicological subjects connected to the carcinogenic effects of chemicals produced by Company 1 and related topics.

38. On or about November 15, 2019, Litzenburg and Attorney 2 spoke by telephone. Prior to the call, Attorney 2 consented to having USPIS record the telephone conversation.

a. On the call, Litzenburg developed more particular demands for the "consulting

15

arrangement." Specifically, Litzenburg stated that Associate 1 (the Chicago-based attorney Litzenburg claimed to work with) would "consult" for Company 1, while Litzenburg in turn would "consult" for Company 2 (the publicly traded company that owned Company 1). Litzenburg stated that he had spoken with Associate 1, and that "we've decided all he [Associate 1] wants to know is that he is consulting for [Company 1]." Litzenburg then stated, of the $200 million "consulting fees" he had demanded, $50 million would go to an entity controlled by Associate 1, and the remaining $150 million would go to Golden Ratio, LLC.

    b. Litzenburg also indicated that, through this arrangement, he would divert cases involving Company 2 or its subsidiaries to Associate 1. Litzenburg stated, "[I]f I have a problem in the future that I need to get it taken care of, and I refer to [Associate 1] a single products [liability] case, he will understand that that is sort of a wink to go to the manufacturer of the product and do a private one off settlement."

## VIII. Litzenburg Emails a Draft "Consulting Agreement" for Associate 1 and a List of Purported Clients He Would Not Tell About Company 1 in Exchange for a "Consulting Agreement"

39. On or about November 24, 2019, Litzenburg emailed Attorney 1 and Attorney 2 with the subject "Deliverables." Litzenburg attached two PDF documents to the email.

40. Litzenburg identified the first attachment as a "client list" of clients that he was representing in the Monsanto-Roundup litigation. The document contained approximately 1,001 entries, each purporting to have the initials of the litigant, the date they were engaged by Litzenburg, the plaintiff's purported state of residence, and the plaintiff's purported zip code.

41. Litzenburg identified the second attachment as the "[s]ubstance of [Associate 1]'s

agreement." The attachment was a one-page "confidential agreement" between Associate 1 and Company 1, in which "[t]he parties agree that [Company 1], as of the date of execution, will retain [Associate 1] as an 'Ad Hoc' consultant."

    a. The document also provided, "This agreement is of strict confidentiality; its existence, nature, content or details shall not be disclosed to third parties (with exception of Timothy Litzenburg) absent express written agreement of the parties or a valid court order."

    b. As to length of service, the document said that "[t]he duration of this consulting relationship shall be 99 years beginning on the date of execution."

    c. Finally, the document provided: "The consideration for said consultancy shall be a one-time payment from [Company 1] to [Associate 1] of FIFTY MILLION DOLLARS ($50,000,000), on January 2, 2020." (Capitalization in Original).

## Conclusion

42. Based on my training and experience, and the information provided in this affidavit, I respectfully submit that there is probable cause to believe that beginning on a date unknown, but from at least in or around September 2019 to November 2019, within the Western District of Virginia, Timothy Litzenburg committed transmission of interstate communications with intent to extort (in violation of 18 U.S.C. § 875(d)), conspiracy to commit transmission of interstate communications with intent to extort (in violation of 18 U.S.C. § 371), and attempted extortion, as well as conspiracy to commit extortion (in violation of 18 U.S.C. § 1951).

I declare under penalty of perjury that the statements above are true and correct to the best of my knowledge and belief.

Inspector Kevin Towers
United States Postal Inspection Service

Sworn to and subscribed before me this 16th day of December, 2019.

The Honorable Joel C. Hoppe
United States Magistrate Judge